| | | |
|---|---|---|
| JAMES FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:24-cv-11329 |
| | ) | |
| AUDACY ILLINOIS, LLC and | ) | Hon. Jeffrey I. Cummings. |
| AUDACY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants Audacy Illinois, LLC and Audacy, Inc. (the "Defendants") by and through

their attorneys, respectfully submit this notice of supplemental authority to alert the Court to the

attached recent decision by the Appellate Court of Illinois, First District, Sixth Division in *Foster

v. Chicago Tribune Company, LLC*, 2026 IL App (1st) 250313-U (Mar. 30, 2026), affirming

dismissal of claims brought by the Plaintiff in this matter James Foster ("Foster") against the

Chicago Tribune on the basis of a news article highly similar to the one at issue in this action.

This decision, though not binding on this Court, is relevant to this Court's consideration of

Defendants' Motion to Dismiss Plaintiff's Complaint (Dkt. 13).

*Foster v. Chicago Tribune* concerned the Tribune's publication of an article on July 14,

2023 (the "Tribune Article") reporting that Foster had been fired from his position as head

baseball coach at Northwestern University "following an internal investigation initiated by

player complaints." 2026 IL App (1st) 250313-U at *1. Foster had asserted two claims: For

defamation *per se* arising from the Tribune Article's reporting that anonymous sources had

"claimed [Foster] discouraged players from seeing the team trainer, or pressured injured players

to speed up their timeline for returning from injury in fear they'd lose their spot on the team," *id*.;

and for false light claim arising from the Tribune Article's reporting that "[i]n 2011, during Foster's time at [the University of] Rhode Island, 20-year-old pitcher Joseph Ciancola collapsed while running during an outdoor strength and conditioning session with the team and died three days later at a hospital. Ciancola's family sued the University eventually settling for 1.45 million according to the Providence Journal."  Foster claimed that in conjunction with the rest of the Tribune Article, this implied he was involved in the player's death.  *Id*.

The appellate court affirmed dismissal of both claims.  It held that the Tribune Article's statements reporting on Foster's conduct toward players at Northwestern University were nonactionable opinion, *id*. at *6, and the statements reporting on the student athlete's death at the University of Rhode Island were not defamatory *per se* and Foster had failed to allege special damages arising from them.  *Id*. at *8.

Accordingly, we ask that the Court take *Foster v. Chicago Tribune* under advisement in its consideration of Plaintiff's pending Motion.

Dated: March 27, 2026
New York, New York

Respectfully submitted,

/s/ *Abigail B. Everdell*
Abigail Everdell (*pro hac vice*)
Elizabeth A. McNamara (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
lizmcnamara@dwt.com
abigaileverdell@dwt.com

Samantha Lachman (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800
samlachman@dwt.com

Douglas W. Bax
Jay Zenker
WILLIAMS, BAX & SALTZMAN, P.C.
221 N. LaSalle Street, Suite 3700
Chicago, Illinois 60601
bax@wbs-law.com
zenker@wbs-law.com

*Attorneys for Defendants Audacy Illinois, LLC and Audacy, Inc.*

## Certificate of Service

I, Abigail B. Everdell, an attorney, hereby certify that I caused a copy of the foregoing

**Defendants' Notice of Supplemental Authority** to be electronically filed with the Clerk of the

Court pursuant to Electronic Filing Procedures and using the CM/ECF system.

/s/ *Abigail B. Everdell*

JAMES FOSTER, Plaintiff-Appellant, v. CHICAGO TRIBUNE..., Not Reported in N.E....

2026 IL App (1st) 250313-U

2026 IL App (1st) 250313-U

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
**NOTICE**: This order was filed under Supreme Court Rule 23 and is not
precedent except in the limited circumstances allowed under Rule 23(e)(1).
Appellate Court of Illinois, First District,
SIXTH DIVISION.

JAMES FOSTER, Plaintiff-Appellant,

v.

CHICAGO TRIBUNE COMPANY, LLC, Defendant-Appellee.

No. 1-25-0313
|
March 20, 2026

Appeal from the Circuit Court of Cook County. No. 24 L 7568 Honorable Stephanie D. Saltouros, Judge, presiding.

Justices Pucinski and Hyman concurred in the judgment.

ORDER

PRESIDING JUSTICE C.A. WALKER delivered the judgment of the court.

**\*1** ¶ 1 *Held:* We affirm the circuit court's dismissal of appellant's claims for defamation and false light because the complained-of statements were not defamatory *per se*, and plaintiff failed to plead special damages.

¶ 2 Plaintiff James Foster, the former head baseball coach at Northwestern University, sued the defendant Chicago Tribune Company, LLC (Tribune), for defamation and false light invasion of privacy (false light) following the Tribune's publication of a story reporting that Foster had been terminated from his position at Northwestern. The Tribune moved to dismiss, which the circuit court granted. As explained below, we affirm because the Tribune was not legally liable for defamation or false light, as the complained-of the statements were true, privileged, or protected opinions. In doing so, however, we acknowledge that the Tribune's article stretched editorial limits and may have caused unwarranted harm to Foster's reputation.

¶ 3 BACKGROUND

¶ 4 Foster filed his complaint on July 9, 2024, in which he alleged that Northwestern University hired him as head baseball coach in the summer of 2022. On July 14, 2023, the Tribune published a story reporting that Northwestern had fired Foster following an internal investigation initiated by player complaints. Foster claimed the following statements from the article (hereinafter "the Northwestern Statements") were untrue and defamatory *per se*:

"Other times, they (anonymous sources including former and current players and individuals close to the program) claimed [Foster] discouraged players from seeing the team trainer, or pressured injured players to speed up their timeline for returning from injury in fear they'd lose their spot on the team."

Foster denied he engaged in the alleged conduct, and contended the passage suggested he lacked "integrity in the performance of his job."

JAMES FOSTER, Plaintiff-Appellant, v. CHICAGO TRIBUNE..., Not Reported in N.E....

2026 IL App (1st) 250313-U

¶ 5 For his false light claim, Foster, who had previously been the head baseball coach at the University of Rhode Island, isolated the following passage (hereinafter "the Rhode Island Statement"):

"In 2011, during Foster's time at Rhode Island, 20-year-old pitcher Joseph Ciancola collapsed while running during an outdoor strength and conditioning session with the team and died three days later at a hospital. Ciancola's family sued the University eventually settling for 1.45 million according to the Providence Journal."

Foster alleged that he had no involvement in the workout precipitating Ciancola's death, but the inclusion of the Rhode Island Statement alongside the allegations of player mistreatment at Northwestern created the opposite impression, constituting false light invasion of privacy. He further alleged that the Tribune's article was the proximate cause of his firing and caused him to suffer injury to his "reputation" and "professional aspirations," and to generally lose income.

¶ 6 The Tribune filed a joint motion to dismiss pursuant to section 2-619.1 of the Illinois Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2022)), arguing in relevant part that (1) the defamation claim failed because the statements were capable of an innocent construction and constituted nonactionable opinion; and (2) the false light claim failed because Foster did not identify an underlying false statement and failed to plead special damages. It noted that the article was published after Northwestern terminated Foster.

 **\*2** ¶ 7 In its supporting memorandum, the Tribune argued on defamation that the Northwestern Statements were capable of innocent constructions because they could be "reasonably understood to mean that Plaintiff was not particularly warm or coddling of student-athletes" and instead was akin to "the proverbial 'hard-nosed' coach often lauded in sports culture." It also supported the interpretation that Foster "wanted his players to toughen up." Neither of these interpretations constituted defamation *per se*, even if they were not "complimentary." Additionally, the Tribune contended the statements were nonactionable opinion because whether someone felt discouraged or pressured was subjective and too general to be objectively verified.

¶ 8 On false light, the Tribune argued that Illinois law required a plaintiff to plead a specific false statement to state a claim, but Foster failed to identify a false statement related to the Rhode Island incident. The Tribune further argued the Rhode Island Statement was capable of an innocent construction as merely relaying an incident in Foster's employment history, not that he was responsible for Ciancola's death. Finally, the Tribune argued the false light claim was not properly based on any statements that were defamatory *per se*, meaning to state a claim Foster had to include allegations of special damages in his complaint, which he failed to do.

¶ 9 The Tribune attached the article to its motion. The full article, as it appears in the record, reads as follows:

**Northwestern dismisses Jim Foster as head baseball coach amid controversy**

**By JONATHAN BULLINGTON I jbullington@chicagotribune.com I** Chicago Tribune

UPDATED: July 14, 2023 at 1 :12 PM CST

Northwestern University has removed Jim Foster as head baseball coach days after news surfaced of controversy surrounding him.

Foster's dismissal as coach one year into the job was announced to players on a video call Thursday afternoon with Northwestern University President Michael Schill and athletic director Derrick Gragg, sources told the Tribune. Assistant coach Brian Anderson, a former player for the Chicago White Sox who was part of the 2005 World Series winning team, will lead the program "during this time of transition," the university said in a statement.

Foster could not be immediately reached for comment. University officials sent a statement from Gragg saying Foster had been "relieved of his duties effective immediately."

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

JAMES FOSTER, Plaintiff-Appellant, v. CHICAGO TRIBUNE..., Not Reported in N.E....

2026 IL App (1st) 250313-U

"Nothing will ever be more important to Northwestern than providing its students a place that allows them to develop in the classroom, in the community, and in competition at the absolute highest level, and building a culture which allows our staff to thrive," Gragg said in the statement. "This has been an ongoing situation and many factors were considered before reaching this resolution. As the Director of Athletics, I take ownership of our head coaching hires and we will share our next steps as they unfold."

In a message to parents obtained by the Tribune, Gragg said the decision was "weighted on multiple factors, including but not limited to, the authentic feedback we received from your student-athletes in postseason surveys."

Foster's departure comes days after the university let head football coach Pat Fitzgerald go amid a hazing scandal that Schill said caused significant damage to students and the university.

Current and former players, alumni and people close to the baseball program previously told the Tribune that they alerted university administration - including Schill and Gragg - of problematic behavior from Foster starting last fall before the team kicked off its 2023 season. At least some of those complaints spurred a human resources investigation.

The university's investigation found "sufficient evidence" that Foster "engaged in bullying and abusive behavior," according to an internal HR document obtained by the Tribune. The probe went on to conclude that Foster "made an inappropriate comment regarding a female staff member, and spoke negatively about his staff to other staff members."

**\*3** The HR document says that the results of the investigation were shared with leaders in the Department of Athletics and Recreation "to take appropriate remedial action." It's unclear what action the university took against Foster. who joined Northwestern after six years at Army West Point.

The HR document does not go into great detail about the complaints against Foster. But current and former players and people close to the program who spoke to the Tribune anonymously for fear of retaliation said Foster's interactions with players and staff could be cold at times, and at other times, combative.

There were incidents, they said, when Foster would launch into expletive laced tirades directed at staff. Other times, they claim, he discouraged players from seeing the team trainer. or pressured injured players to speed up their timeline for returning from injury in fear they'd lose their spot on the team.

While these allegations were not made public, signs of trouble were visible. In February, hitting coach and recruiting coordinator Dusty Napoleon, who had been with the team since 2015, left before the first game of the season. By the time the team returned from that opening road trip, pitching coach Jon Strauss and operations director Chris Beacom had also left the team.

A month later, growing concerns over Foster's leadership began to spread outside the team's inner circle. In March, Northwestern graduate and longtime professional sports broadcaster Glenn Geffner emailed Gragg.

In that email, which Geffner later shared with the Tribune, he wrote: "Eight months after Jim Foster arrived in Evanston, the Northwestern baseball program is in shambles, both on - and more urgently - off the field ."

The email went on to summarize issues Geffner wrote were relayed to him by "current and former members of the Northwestern baseball family spanning decades."

"If the truth about what is happening at Northwestern under Jim Foster becomes widely known, the black eye on the program and the university will be severe," he wrote.

After the team's 10-40 season concluded, 16 players entered the transfer portal, sources told the Tribune, and at least a half-dozen players individually met with Gragg or other athletic department leaders to voice their concerns over Foster.

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

"The season was a disaster in every way. And the fallout is even worse," Geffner wrote to Gragg in another email, sent in June and shared with the Tribune. "The number of young men entering the transfer portal because of Jim Foster is simultaneously frightening, embarrassing and sad. This is unprecedented in the history of our university. Northwestern has let these student-athletes down."

Foster's previous coaching stints included six years as head coach at Army West Point, two seasons as associate head coach at Boston College, and nine seasons as head coach with the University of Rhode Island.

Former Rhode Island players who spoke to the Tribune called Foster a great leader and a mentor-a teacher, tough, but fair, who cared deeply about his teams.

"He was by far the best coach I've ever had," said Josh Nestor, 39, who played for Foster in 2005 and 2006.

In 2011, during Foster's time at Rhode Island, 20-year-old pitcher Joseph Ciancola collapsed while running during an outdoor strength and conditioning session with the team and died three days later at a hospital.

 **\*4** Ciancola's family sued the university, eventually settling for $1.45 million, according to the Providence Journal.

¶ 10 Foster responded, arguing, on defamation *per se*, that the Northwestern Statements had only one reasonable, defamatory interpretation—that he "compromised the physical health and safety of his players." Any other interpretation was unreasonable and thus did not invoke the innocent construction rule. He stated, "It is nonsensical for any reader to believe that a college coach was fired because he encouraged his players to be tough and work hard." Foster further argued that the Tribune demonstrated its defamatory intent by including the Rhode Island Statement at the end of the article, which could only have the "sole reasonable interpretation" that "Foster dangerously disregards the safety of his players, and this is a pattern with his coaching." Respecting whether the Northwestern Statements constituted nonactionable opinion, Foster argued the Tribune presented the Northwestern Statements as factual assertions which could be proven true or false.

¶ 11 On false light, Foster contended that a plaintiff could maintain a false light claim without also establishing defamation, and in any event, Foster's claim was predicated on defamatory *per se* false statements—the Northwestern Statements—and their inclusion alongside the Rhode Island Statement. Additionally, Foster argued the innocent construction rule did not apply because there was no reasonable innocent interpretation of the Rhode Island Statement when considered in the full context of the article. Finally, Foster argued that because the Northwestern Statements were defamatory *per se*, he did not need to allege special damages to state a claim for false light.

¶ 12 The Tribune replied on December 24, 2024, emphasizing that the article never claimed Foster forced a player "to return to play with an injury," and contained positive opinions about Foster's coaching alongside the Northwestern Statements and Rhode Island Statement.

¶ 13 On January 24, 2025, the circuit court granted the Tribune's motion. In its written order, the court found the Northwestern Statements were capable of a reasonable innocent construction, as "it cannot be said that the only interpretation of the statements is that [Foster] compromised the health or safety of his players" because they could also be interpreted "as indicating that some people considered [Foster's] coaching style abrasive or harsh." Moreover, the Northwestern Statements were nonactionable opinion, as "the words 'discouraged' and 'pressured' are not objectively verifiable." On false light, the court found the innocent construction rule barred the claim because the Rhode Island Statement could be interpreted as merely relaying Foster's employment history. The claim also failed because, based on the findings that the Northwestern Statements were not defamatory *per se*, Foster needed to plead special damages to sustain a false light claim, which he failed to do. Finally, the court specified that it dismissed the entire complaint pursuant to section 2-619, and the false light claim specifically under section 2-615, as well. This appeal followed.

JAMES FOSTER, Plaintiff-Appellant, v. CHICAGO TRIBUNE..., Not Reported in N.E....

2026 IL App (1st) 250313-U

¶ 14 JURISDICTION

**\*5** ¶ 15 The circuit court granted the Tribune's motion for summary judgment on January 24, 2025, and Foster filed his notice of appeal on February 19, 2025, giving this court jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017).

¶ 16 ANALYSIS

¶ 17 On appeal, Foster argues each of his claims was valid and should not have been dismissed. We begin with defamation.

¶ 18 I. Defamation

¶ 19 The circuit court dismissed Foster's defamation claim under section 2-619 of the Illinois Code of Civil Procedure (735 ILCS 5/2-619 (West 2022)). A motion to dismiss under section 2-619 is based upon a legal defect that prevents the plaintiff from pursuing their claim, including, as relevant here, that one or more affirmative defenses bar the claim. 735 ILCS 5/2-619(a)(9) (West 2022).

¶ 20 To successfully state a claim for defamation, a plaintiff must allege facts as to three elements: (1) the defendant made a false statement about the plaintiff, which the defendant then (2) published to a third party without the privilege to do so, resulting in (3) the plaintiff suffering damages. *project44, Inc. v. FourKites, Inc.*, 2024 IL 129227, ¶ 20. There are two types of defamatory statements—defamation *per se* and defamation *per quod*. *Tuite v. Corbitt*, 224 Ill. 2d 490, 501 (2006). Foster limits his defamation claim to the argument that the Northwestern Statements constituted defamation *per se*.

¶ 21 A defamatory statement constitutes defamation *per se* if it fits one of five categories:

"(1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; (4) words that prejudice a party, or impute a lack of ability, in his or her trade, profession or business;" and (5) words that impute a person has engaged in adultery or fornication. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 88 (1996) (noting the first four categories derive from common law, while the fifth was a statutory creation).

Foster argues that the Northwestern Statements implicated both categories (3) and (4). A defamatory *per se* statement is so inherently offensive that actual damage to reputation is presumed and damages need not be specifically alleged in the plaintiff's complaint. *Id.* at 87-88.

¶ 22 Not all statements that fit the defamation *per se* categories will be actionable as defamation. One such exception is for statements of opinion. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 581 (2006). "[A] defamatory statement is constitutionally protected [as opinion] only if it cannot be reasonably construed as stating actual facts." *Tuite*, 224 Ill. 2d at 508. Guiding considerations for this analysis include "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Solaia*, 221 Ill. 2d at 581. "[T]he question of whether a statement of opinion is actionable as defamation is one of degree; the vaguer and more generalized the opinion, the more likely the opinion is nonactionable as a matter of law." *Wynne v. Loyola University of Chicago*, 318 Ill. App. 3d 443, 452 (2000).

**\*6** ¶ 23 Another defense is the innocent construction rule, under which "even if an alleged statement falls into one of the categories of words that are defamatory *per se*, it will not be actionable *per se* if it is reasonably capable of an innocent

JAMES FOSTER, Plaintiff-Appellant, v. CHICAGO TRIBUNE..., Not Reported in N.E....

2026 IL App (1st) 250313-U

construction." *Green v. Rogers*, 234 Ill. 2d 478, 499 (2009). If a statement is reasonably capable of both innocent and defamatory constructions, the circuit court must give it the innocent construction. *Id.* at 500. "The preliminary construction of an allegedly defamatory statement is a question of law, and our review therefore is *de novo*." *Id.* at 492. We may affirm on any basis supported by the record. *Eberhardt v. Village of Tinley Park*, 2024 IL App (1st) 230139, ¶ 20.

¶ 24 We find the Northwestern Statements were not reasonably understood as communicating facts, and instead constituted statements of opinion, and were thus nonactionable. We affirm on this basis alone, and do not comment on the lower court's analysis of whether the Northwestern Statements were capable of a reasonable innocent construction.

¶ 25 First, we must clarify what the article did and did not say. The Tribune did not report that Foster *in fact* "pressured" his players to return early from injuries, or "discouraged" his players from seeking medical care from the trainer. The statements in the article were that sources close to the program "claimed" Foster engaged in that conduct in comments they made to the Tribune. Thus, the actual statements in the article are simply that certain sources made certain comments to the Tribune, and the truth of whether those sources in fact made those comments to the Tribune is not challenged in Foster's complaint. As such, facially, there is no claim that the Northwestern Statements are false and thus cannot form the basis of a defamation claim. See *Andrews v. At World Properties, LLC*, 2023 IL App (1st) 220950, ¶ 16 ("truth is an absolute defense to defamation"); *project44*, 2024 IL 129227, ¶ 20 (The first element of a defamation claim is that the defendant made a false statement.).

¶ 26 For Foster to clear this initial hurdle, we would have to accept his characterization of the Northwestern Statements as an attempt to hide defamatory statements in the deceptive form of reporting what a third party stated. Under Illinois law, one is not shielded from liability for defamation simply because they republished a third party's defamatory comments, or by obfuscating a defamatory comment using thinly veiled opinion language. *Snitowsky v. NBC Subsidiary (WMAQ-TV), Inc.*, 297 Ill. App. 3d 304, 310-11 (1998); see also *Solaia*, 221 Ill. 2d at 581 ("a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole"). Even accepting that the Northwestern Statements can be understood as covered by these aspects of defamation law, however, Foster's claim still fails because no reasonable reader would understand the Northwestern Statements as conveying facts.

¶ 27 Each of the factors Illinois courts use to analyze whether a statement is one of fact or opinion weighs in the Tribune's favor. Respecting precision versus generality, the Tribune took pains to generalize—it did not use any player's name, identify dates, time frames, or incidents, and did not describe anything about the nature of any particular injury. Such statements would have represented concrete details with precise meanings, but the Northwestern Statements use abstraction to prevent the appearance of attempting to convey facts with precise meanings, making this factor weigh in favor of opinion. *Schivarelli v. CBS Inc.*, 333 Ill. App. 3d 755, 762 (2002) (A statement was opinion when it was made without "any specific factual context.")

 **\*7**  ¶ 28 On verifiability, the Tribune did not reprint anything that was objectively verifiable, but instead the mental impressions of individuals about amorphous events given no definite time or place. *Id.*; see also *Hopewell v. Vitullo*, 299 Ill. App. 3d 513, 520 (1998) (The statement that the plaintiff Hopewell, who was fired as treasurer and CFO of the Carol Mosely Braun for U.S. Senate Committee, was "incompetent" was one of opinion because it was "too broad, conclusory, and subjective to be objectively verifiable," as verification would "entail an endless analysis of each and every fact connected with the execution of Hopewell's duties."). A report that someone felt "pressured" or "discouraged" is facially only relaying an individual's subjective viewpoint and is only reasonably understood as such. *Brennan v. Kadner*, 351 Ill. App. 3d 963, 969 (2004) (citing *Moriarty v. Greene*, 351 Ill. App. 3d 225, 235 (2000. Whether Foster's conduct constituted pressuring or discouragement cannot be objectively verified through witness interviews or other means to show Foster engaged in any course of wrongful conduct, as the conclusion would be dependent on each witness' subjective experience of what constitutes pressure or discouragement. The use of such vague terms again suggests to the reader that the Tribune is not making specific allegations of fact.

¶ 29 Finally, regarding the literary or social context, the Tribune's framing of the Northwestern Statements as the summations of third party complaints about how some players felt takes the Northwestern Statements out of the category of statements that could be reasonably be understood as conveying facts. Foster suggests our outcome should be impacted by the fact the Tribune

JAMES FOSTER, Plaintiff-Appellant, v. CHICAGO TRIBUNE..., Not Reported in N.E....

2026 IL App (1st) 250313-U

did not publish its comments in the "Opinion" section of its newspaper, but that is not the standard for determining whether a statement constitutes nonactionable opinion, and Foster presents no caselaw to the contrary. While it is true that the Northwestern Statements appeared in an article containing factual reporting, the Tribune specifically prefaced the Northwestern Statements themselves as the accounts of anonymous sources who were either current or former players, or individuals close to the program, distinguishing the statements from those other portions of the article purporting to relate specific facts. Immediately, then, the literary context for the reader is that this portion of the article is meant to relay the subjective accounts of third parties in the context of an internal investigation into whether Foster should maintain his employment, not objective facts. See *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 867 (1995) ("In the social context of employment interviews, evaluations of an employee may include comments which communicate subjective opinions.").

¶ 30 In so finding, we acknowledge Foster's argument that the bare fact of reporting statements from a third party does not in and of itself shield a defendant from liability for defamation. See *Snitowsky*, 297 Ill. App. 3d at 311 (A "republisher remains liable for damages caused by the republication of defamatory material."). This argument cannot save Foster, however, because his defamation claim fails due to the Northwestern Statements not being defamatory, not on any issue of republisher liability.

¶ 31 Similarly, Foster's lengthy discussion of *Owen v. Carr*, 113 Ill. 2d 273 (1986), does nothing to aid his position. In *Owen*, the defendant Carr, an attorney, gave a quote to the National Law Journal regarding a case the plaintiff Owen had brought against Carr's client, Judge William B. Starnes. *Owen*, 113 Ill. 2d at 276. Carr's comments intimated that Own brought the suit against Judge Starnes for improper purposes. *Id.* The Illinois Supreme Court found, in relevant part, that there was a general constitutional protection for expressions of opinion per the United States Supreme Court's decision in *Gertz v. Robert Welch, Inc.*, 418 U.S 323 (1974), and that Carr's comment fell under this protection because, "the statements may reasonably be viewed as an expression of Carr's opinion regarding his client's allegations against Owen." *Id.* at 280-81. Foster argues, *Owen* was decided before the United States Supreme Court limited the conception of what is protected opinion in defamation cases in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) (rejecting an "artificial dichotomy between 'opinion' and fact and finding only statements "that cannot reasonably be interpreted as stating actual facts" are nonactionable).

 **\*8** ¶ 32 *Owen* does not alter our conclusion. Foster is correct that the standard for what constitutes opinion as established in *Milkovich* is the proper standard, but our finding is based on that standard. As explained above, the Tribune took multiple steps to remove the Northwestern Statements from statements of fact, and it is these levels of abstraction that pushed the Statements from specific and verifiable to general and subjective, and thus not reasonably understood as an attempt to state actual facts, satisfying *Milkovich*. *Id.*; see *Wynne*, 318 Ill. App. 3d at 452. The Tribune's failure to present the Northwestern Statements as opposing sides of a disputed issue does not affect whether the statements were opinions, fully obviating Foster's discussion of *Owen*.

## ¶ 33 II. False Light

¶ 34 The circuit court dismissed Foster's false light claim pursuant to section 2-615. 735 ILCS 5/2-615 (West 2022). "A motion to dismiss under section 2-615 challenges the legal sufficiency of the complaint, so our review of such a dismissal is *de novo*." *Rice v. Marathon Petroleum Corp.*, 2024 IL 129628, ¶ 22. In considering a section 2-615 motion to dismiss, a court will accept all well-pleaded facts as true and construe the complaint's allegations in the light most favorable to the plaintiff to determine if the allegations are sufficient to state a claim upon which the court may grant relief. *Id.*

¶ 35 To establish a claim for false light, a plaintiff must allege he was "(i) being placed in a false light before the public due to the defendant's actions, (ii) the false light would be highly offensive to a reasonable person, and (iii) the defendant acted with actual malice, that is, with knowledge the statements were false or reckless disregard for their truthfulness." *Rosenbaum v. Samler*, 2025 IL App (1st) 240039, ¶ 35. If a false light claim is not predicated on statements that are defamatory *per se*, allegations of special damages are mandatory to state a claim. *Chang Hyun Moon v. Kang Jun Liu*, 2015 IL App (1st) 143606, ¶ 17. The innocent construction rule applies to false light claims. *Benton v. Little League Baseball, Inc.*, 2020 IL App (1st) 190549, ¶ 87.

¶ 36 Foster's false light theory is a unique attempt at bootstrapping the true-on-its-face Rhode Island Statement into becoming actionable for false light when considered in combination with the Northwestern Statements. Specially, because he claims that by printing the Rhode Island Statement in the same article with the defamatory *per se* Northwestern Statements, the Tribune created the offensive and inaccurate impression that because Foster was a coach who overworked his players, he must have been at fault for Ciancola's death.

¶ 37 We find that Foster cannot sustain his false light claim because he did not include allegations describing his special damages in his complaint. Foster's false light claim is predicated on the characterization of the Northwestern Statements as defamatory *per se*, a characterization we reject. This leaves Foster with no defamatory *per se* comments underlying his false light claim, meaning that, under Illinois law, it was incumbent upon him to include allegations of special damages in his complaint to state a claim. *Chang Hyun Moon*, 2015 IL App (1st) 143606, ¶¶ 17-18. He did not, and indeed, does not even claim to have done so, as the complaint only lists the most generalized categories of damages to his reputation, aspirations and income, along with the paradoxical proposition that an article reporting he had been fired in the past somehow caused that firing. Such allegations, of course, fall far short of the particularity needed to properly plead special damages. See *Rivera v. Allstate Insurance Co.*, 2021 IL App (1st) 200735, ¶ 49. Foster protests that he was not involved in the events leading to Ciancola's death, and we have no reason on this record to doubt this representation. But the article did not state that he was, meaning that to successfully state a claim, Foster needed to include certain allegations which are simply absent from his complaint.

**\*9** ¶ 38 Before concluding, we note that the parties debate at length whether, under Illinois law, a plaintiff may sustain a false light claim without specifying a particular false statement on which the claim is based. Foster contends a plaintiff need not do so. We do not resolve whether Foster's proposition is correct, as his argument does not properly raise this issue; Foster's false light theory, instead, attempts to bootstrap a true statement into being actionable by combining it with the allegedly false statements of fact in the Northwestern Statements.

¶ 39 CONCLUSION

¶ 40 The Northwestern Statements were statements of opinion and thus nonactionable, meaning Foster failed to sufficiently plead the elements of false light by not including allegations regarding special damages. In so holding, we note that the Tribune's reporting on Foster's time at Rhode Island included extraneous details that bore little connection to Foster. While such editorial choices may fairly be criticized as lacking sound journalistic judgment, the First Amendment protects even reporting that may be viewed as imprudent or lacking editorial restraint. Because the publication is legally protected, we affirm the circuit court's dismissal of Foster's complaint.

¶ 41 Affirmed.

**All Citations**

Not Reported in N.E. Rptr., 2026 IL App (1st) 250313-U, 2026 WL 789208

---

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.